UNDER SEAL

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

DEC -4 2017

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JAVELL MARQUES JOHNSON,<br>a/k/a "Jack,"<br><br>Defendant. | **UNDER SEAL**<br><br>Case No. 1:17-mj-558<br><br>The Hon. Theresa Carroll Buchanan |

AFFIDAVIT IN SUPPORT OF A
CRIMINAL COMPLAINT AND ARREST WARRANT

I, Jonathan F. Earle, being duly sworn, depose and state as follows:

**INTRODUCTION**

1. I have been a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") for approximately eight years. Since March 2013, I have been assigned to the Washington Field Division's Firearms Trafficking Group and the Falls Church Group II. My assignments include investigating individuals who are involved in the illegal possession and transfer of firearms, violent crimes involving firearms, and narcotics trafficking.

2. This affidavit is submitted in support of a criminal complaint and arrest warrant charging JAVELL MARQUES JOHNSON (also known as "Jack" and hereinafter "JOHNSON") with the possession with intent to distribute over one hundred (100) grams of heroin, in violation of Title 21, United States Code, Section 841(a)(1) & (b)(1)(B).

3. This affidavit does not contain every fact known to me regarding this investigation, but rather contains information necessary to demonstrate probable cause in support of the above-referenced criminal complaint and arrest warrant. The facts and information contained in this affidavit are based on my personal knowledge and information obtained from other law enforcement officers. All observations referenced in this affidavit that were not personally made by me were relayed to me by the person(s) who made such observations or in reports that detailed the events described by that person.

**PROBABLE CAUSE**

A. <u>Background on the Investigation</u>

8. In June 2017, a cooperating source ("CI-1") reported to the Prince William County Police Department (PWCPD) that JOHNSON was a narcotics distributor. CI-1 will be referred to in the masculine gender, regardless of CI-1's true gender. CI-1 has previous convictions for Possession of a controlled substance, Forgery, and probation violations. CI-1 used to be a federal CI. However, CI-1 became untruthful, and federal law enforcement stopped using him.

9. On June 8, 2017, CI-1 reported he could introduce a PWCPD Undercover Detective (UC) to JOHNSON. CI-1 stated JOHNSON was looking to sell a .40 caliber pistol that he was obtaining from a Pakistani male. CI-1 reported JOHNSON was selling heroin as well. CI-1 introduced the UC to JOHNSON over the phone. JOHNSON had previously been convicted of a felony and is prohibited from possessing firearms.

B. <u>Controlled Purchase of Heroin from JOHNSON on June 9, 2017</u>

10. On June 8, 2017, the UC received a text message from (xxx) xxx-7929. Law enforcement knew this phone number belonged to JOHNSON because JOHNSON had used the

2

same phone number during controlled purchases of narcotics in 2015 and 2016. In addition, the individual using the phone introduced himself as "Jack," and "Jack" is the known alias of JOHNSON. The UC confirmed that CI-1 had informed JOHNSON what he was looking for, referencing heroin and a firearm. JOHNSON reported he was ready "tonight, 2morrow, whenever you ready". The UC and JOHNSON agreed to meet on June 9, 2017.

11. On June 8, 2017, law enforcement conducted surveillance at 3830 Pinewood Terrace, Falls Church, VA 22041, the suspected residence of JOHNSON. Law enforcement observed a Jeep bearing a Virginia license plate parked at the location. A query of Department of Motor Vehicle records revealed the vehicle is registered to JOHNSON and another individual at 3830 Pinewood Terrace, Falls Church, VA.

12. On June 9, 2017, law enforcement again established surveillance on 3830 Pinewood Terrace, Falls Church, VA. At approximately 10:42 am, law enforcement observed JOHNSON exit the residence.

13. The same day, at approximately 12:20 pm, the UC contacted JOHNSON via text message and asked if he was ready to meet. JOHNSON reported he was in Alexandria, Virginia, near Landmark mall. JOHNSON instructed the UC to meet him at the Shoppers Food Warehouse where Duke and Little River Turnpike meet. The UC asked JOHNSON if he was able to get the firearm. JOHNSON reported he was working on it, but it was hard because it was summertime.

14. Prior to the controlled purchase, law enforcement searched the UC and his vehicle and found them to be free of illegal contraband. Law enforcement then provided the UC with ATF agent cashier funds to conduct the controlled purchase. The controlled purchase was also audio/video recorded.

15. Continuing on this date, at approximately 12:46 pm, law enforcement observed JOHNSON exit his residence at 3830 Pinewood Terrace, Falls Church, VA and get into a black sedan later identified as being a Nissan Altima bearing a Virginia license plate. At approximately 12:57 pm, JOHNSON entered the Shoppers Food Warehouse parking lot and entered the UC's vehicle. JOHNSON ask the UC how he knew CI-1. The UC stated he used to get from him (CI-1) in the Springfield area, but CI-1 wasn't dealing anymore, so he needed a new source. JOHNSON asked the UC if he fucked with the girl (purchased cocaine). The UC asked JOHNSON if he dealt that as well, and JOHNSON replied, "I've got everything, for real." JOHNSON stated he had three (3) grams on him for $240. The UC stated he wanted 3.5 grams of heroin. JOHNSON said he didn't know that, but the cost would be $275. JOHNSON reached into his right side and brought out a small plastic bag with a powdery substance consistent with heroin. The UC provided JOHNSON with $240 of agent cashier funds.

16. The UC asked JOHNSON about firearms. JOHNSON said "his shit just popped off and niggas ain't trying to sell anything." The UC asked JOHNSON about selling one of his personal firearms. JOHNSON said they were his babies. JOHNSON stated he had two firearms, a .45 and 9mm, and his girlfriend had a .380. The UC asked him to sell the .45 and JOHNSON replied, "That's my baby, my girl gave that to me as a gift." JOHNSON stated he might sell the 9mm, but told the UC to give him a little while.

17. The UC asked JOHNSON if he had a firearm on him. JOHNSON stated "Yea, I always got my 9." The UC asked JOHNSON to let it go and JOHNSON stated, "There's no point, bro. I just got in a shootout three days ago." JOHNSON stated he had bullet holes in his car from the shooting, which took place in Maryland.

18. JOHNSON had the UC drive by his vehicle and JOHNSON pointed out the bullet holes to the UC. JOHNSON stated he was with two of his friends in Oxon Hill, Maryland when the shooting happened, in Eastover near Third Street. JOHNSON stated that one of his men was shooting back at the people.

19. JOHNSON stated the shooting is why he isn't really selling his firearms right now. JOHNSON stated his homeboy, a Pakistani, was trying to sell his firearm. The UC stated he wanted too much and JOHNSON agreed. JOHNSON stated the UC could get guns down south for better prices. JOHNSON stated the UC could go to DC to get guns, but it is "hot" (increased presence of law enforcement). JOHNSON asked the UC he had any friends that didn't have a record because they could just walk into a gun store and buy it clean and it would be under their name.

20. The UC asked JOHNSON if he had people in New York. JOHNSON stated, "I'm Blood." JOHNSON reported he had just taken his Jeep to New York, but they left the same night they got there because they all had guns on them and the police jumped out on them asking what they were doing in New York and if they were selling firearms.

21. JOHNSON stated he had china white, tan, black, and brown heroin. The UC asked how much for a zone (ounce) and JOHNSON stated $2500. JOHNSON stated for an ounce, the UC would have to drive to his man's house. JOHNSON then stated they could do the deal for an ounce at National Harbor, which the UC agreed to do in the future.

22. At approximately 1:05 pm, the deal was concluded and JOHNSON exited the UC's vehicle. Law enforcement observed JOHNSON walk into Shoppers Food Warehouse then walk

out a short time later and enter the black Nissan Altima. Law enforcement followed JOHNSON from the parking lot back to the 3830 Pinewood Terrace, Falls Church, VA.

23. The UC then drove to a location to meet law enforcement. The UC provided law enforcement with the three (3) grams of suspected heroin. The UC and the UC's vehicle were searched for contraband with negative results. The suspected heroin was transported to the ATF Falls Church field office and determined to weigh approximately 3 grams. The suspected heroin was sent to the DEA mid-Atlantic laboratory for analysis. The tests confirmed that the substance weighed 3.1 grams and contained heroin.

C. Controlled Purchase of Heroin from JOHNSON on June 15, 2017

24. On June 14, 2017, the UC was supposed to meet JOHNSON to purchase an ounce of heroin. Prior to the controlled purchase, JOHNSON contacted the UC and stated his girlfriend's father passed away and JOHNSON would have to do the deal on June 15.

25. On June 15, 2017, at approximately 12:49 pm, the UC contacted JOHNSON and asked JOHNSON where he would like to meet. JOHNSON told the UC to park near the Cadillac Ranch located on Fleet Street in Oxon Hill, Maryland. JOHNSON stated he would be in the area on foot and would walk to meet the UC. Prior to the controlled purchase, law enforcement searched the UC and his vehicle and found them to be free of illegal contraband. Law enforcement then provided the UC with ATF agent cashier funds to conduct the controlled purchase. The controlled purchase was also audio/video recorded.

26. Before the controlled purchase, law enforcement established surveillance at 3830 Pinewood Terrace, Falls Church, VA. JOHNSON's black Nissan with bullet holes pulled into the driveway. At approximately 12:36 pm, law enforcement observed JOHNSON exit the residence

6

and drive away in the Jeep bearing the Virginia license plate. At approximately 1:36 pm, law enforcement observed JOHNSON park the Jeep on the side of the Cadillac Ranch. Law enforcement observed JOHNSON exit his vehicle and leave on foot.

27. At approximately 1:46 pm, the UC contacted JOHNSON and gave him his location. Law enforcement observed JOHNSON get into the front passenger seat of the UC's vehicle. JOHNSON stated to the UC he just saw a bunch of police. JOHNSON had the UC drop him off back at his Jeep. JOHNSON told the UC to follow him to the Tanger Outlets. The UC followed JOHNSON to the Tanger Outlets in Oxon Hill, Maryland. At approximately 1:57 pm, JOHNSON was observed getting back into the UC's vehicle. When JOHNSON got into the UC's vehicle, JOHNSON was on his cell phone. JOHNSON told an unidentified person on the phone that he was going to pull around because some other people had just pulled up on him and the UC. JOHSON had the UC drive around the Tanger Outlets and park again. JOHNSON informed the UC that he was going to give the heroin to the UC the same way he gets it from his man.

28. The UC asked JOHNSON about firearms. JOHNSON stated he had just sold his man a .45.

29. JOHNSON had the UC pull over. Concerned by the presence of police cruisers, JOHNSON told the UC not to park and said he would call the UC when he was ready to be picked up. JOHNSON asked the UC if he had his cash ready, the UC stated he did.

30. JOHNSON exited the vehicle and was observed by law enforcement meeting with an African American male in a blue Toyota bearing a Virginia license plate. A Department of Motor Vehicle records query revealed the vehicle was registered to an individual with a Washington, DC address. The UC also observed JOHNSON meet with a heavy-set African

7

American male in the blue Toyota. At approximately 2:04 pm, JOHNSON contacted the UC and told the UC to go back to where they pulled over. At approximately 2:06 pm, JOHNSON came up to the UC's driver's window and provided the UC with a cup. JOHNSON informed the UC the heroin was in the cup. The UC asked the JOHNSON if he had a firearm on him. JOHNSON stated he did. The UC asked to purchase the firearm, but JOHNSON stated he did not want to sell it right now. JOHNSON stated he was going to Newport News soon and prices were cheaper for firearms there. JOHNSON stated everything was under $300 there. JOHNSON stated his homies had contacted him that morning to sell him firearms, and he was just waiting on the terms. JOHNSON stated the UC is about to "have everyone on his line" (supply everyone with controlled substances and firearms).

31. After the controlled purchase, the UC then drove to a predetermined location to meet law enforcement. The UC provided law enforcement with the suspected heroin. The UC and the UC's vehicle were searched for contraband with negative results. The suspected heroin was transported to the ATF Falls Church field office and determined to weigh approximately twenty-eight (28) grams. The suspected heroin was sent to the DEA mid-Atlantic laboratory for analysis The tests confirmed that the substance weighed 28.22 grams and contained heroin.

D. Attempted Controlled purchase from JOHNSON on June 29, 2017

32. On June 23, 2017, JOHNSON contacted the UC and informed the UC he would be back in the morning and asked the UC what he needed. On June 24, 2017, the UC responded to JOHNSON stating he wanted an ounce of heroin. JOHNSON stated he was ready when the UC was. On June 25, 2017, JOHNSON contacted the UC and stated he was going out of town. The UC informed JOHNSON he planned to "shop" with him on June 29 and asked if the tools

8

(firearms) had come in. JOHNSON replied, "Yea but my boy is taxing". The UC asked what kind of firearm and how much tax. JOHNSON stated "He want 6 for a 9". The UC asked JOHNSON if he could get the firearm for $500. JOHNSON stated "I wouldn't do it myself, Patience bro ima get u straight.. u kan cash that".

33. On June 28, 2017, the UC contacted JOHNSON and confirmed they would meet around 12:30 pm on June 29. The UC informed JOHNSON he was ordering two ounces of heroin (56 grams). JOHNSON stated "U gotta meet me at the trap. I promise you...U good..on me..Ima send u the street it's right off the Pennsylvania exit...or u could ride wit me...it's up 2 u I'm just make it be known u good".

34. On June 29, 2017, JOHNSON contacted the UC and told the UC to meet him at White Place, Southeast, Washington, DC. The UC agreed to meet JOHNSON in the area. Around 12:18 pm, the UC told JOHNSON that the UC was about to break for lunch and would be on the road to meet him. JOHNSON responded and told the UC the new address would be on N Street, Southeast, in Washington, DC. Prior to the controlled purchase, law enforcement searched the UC and his vehicle and found them to be free of illegal contraband. Law enforcement then provided the UC with $5000 of ATF agent cashier funds to conduct the controlled purchase. The controlled purchase was also audio/video recorded.

35. At approximately 1:17 pm, the UC was contacted by JOHNSON and was instructed to park at a BP gas station located at the corner of Pennsylvania Avenue and Minnesota Avenue, Southeast. At approximately 1:18 pm, law enforcement observed a blue Toyota bearing the same Virginia license plate as the blue Toyota observed on June 15 drive through the parking lot of the BP gas station. The UC received a text message from JOHNSON instructing him to

9

move to the intersection of N Street and Minnesota Avenue, Southeast. The UC drove to that location and at approximately 1:27 pm, JOHNSON got into the front passenger seat of the UC's vehicle.

36. JOHNSON attempted to get the UC to go on to N Street to complete the transaction, but the UC refused for safety reasons. JOHNSON stated his source was down the street in a church parking lot, but did not want to meet the UC. JOHNSON said he had to go down the street to get the heroin. The UC provided JOHNSON with the $5000 of ATF agent cashier funds. Prior to exiting the vehicle, JOHNSON told the UC that there was a rumor going around about CI-1 that CI-1 was working for the police. JOHNSON exited the vehicle and walked down N Street. The UC lost sight of JOHNSON and surveillance units did not observe JOHNSON exit the vehicle. JOHNSON never returned to the UC with the heroin. The UC attempted to contact JOHNSON several times without success and law enforcement terminated the operation.

37. At approximately 3:12 pm, law enforcement observed JOHNSON sitting outside the 3830 Pinewood Terrace, Falls Church, VA. The UC continued to contact JOHNSON with negative results.

E. Purchase of Heroin from Co-Conspirator 1

38. In April 2017, the UC was introduced to Co-Conspirator 1 through PWCPD Confidential informant (CI-2). CI-2 will be referred to in the masculine gender, regardless of CI-2's true gender. CI-2 has been convicted of three felonies, including distribution of controlled substance a probation violation. He was arrested in September of 2016, in Prince William County, Virginia, for possession of controlled substances, possession of controlled substances

with intent to distribute, and possession of a firearm with an obliterated serial number. CI-2 cooperated because he hoped to receive a lesser sentence.

39. CI-2 identified Co-Conspirator 1 as a source of supply of heroin and firearms in Prince William County, Virginia. Law enforcement conducted several controlled purchases of heroin and firearms from Co-Conspirator 1 between April 2017 and July 2017. Before each controlled purchase, law enforcement searched the UC and the UC's vehicle and found them to be free of illegal contraband. Law enforcement then provided the UC with ATF agent cashier funds to conduct the controlled purchases of heroin. The controlled purchases were also audio recorded. All of the controlled purchases were conducted in Prince William County, Virginia. The suspected heroin was sent to the DEA mid-Atlantic laboratory for analysis. The suspected heroin purchased on May 17, 2017 was analyzed by the DEA mid-Atlantic laboratory and was determined to be fentanyl. All other suspected heroin tested positive for the presence of heroin.

40. Law enforcement purchased heroin from Co-Conspirator 1 on the following dates:

- May 4, 2017 –9.93 grams
- May 9, 2017 –28.01 grams
- May 17, 2017 –55.76 grams (fentanyl)
- June 1, 2017 –27.55 grams
- June 14, 2017 –27.49 grams
- July 5, 2017 –55.21 grams

11

41. On July 5, 2017, law enforcement arrested Co-Conspirator 1. After being taken to a nearby police station and after being read his *Miranda* rights and waiving those rights, law enforcement interviewed Co-Conspirator 1. During the interview, Co-Conspirator 1 identified JOHNSON as his source of supply of heroin. Co-Conspirator 1 pleaded guilty to using and carrying a firearm during and in relation to a drug trafficking crime, in violation of Title 18, United States Code, Section 924(c) and conspiracy to distribute over one hundred grams of heroin in violation of Title 21, United Sates Code, Section 846.

42. After Co-Conspirator 1 pleaded guilty to the federal charges described above, Co-Conspirator 1 spoke with law enforcement on September 14, 2017. Co-Conspirator 1 was shown a photo of JOHNSON and identified him as "Jack." Co-Conspirator 1 again identified JOHNSON as his source of supply for heroin. Co-Conspirator 1 stated he purchased an ounce of heroin per week from JOHNSON and has been working with JOHNSON for 2-3 months. Co-Conspirator 1 stated he would purchase an ounce of heroin from JOHNSON and then cut the heroin with miralax to make two ounces. Co-Conspirator 1 stated the heroin purchased on the above dates was supplied by JOHNSON.

43. Co-Conspirator 1 stated he would meet JOHNSON in Alexandria, Virginia to purchase heroin from JOHNSON. Co-Conspirator 1 also stated he also would meet JOHNSON in Alexandria, Virginia and travel with JOHNSON to Washington DC in the area of Minnesota Drive and park beside a church to purchase heroin from JOHNSON's source of supply identified as "Dough" or "Doe" (hereinafter referred to as "Dough"). JOHNSON would be the middle man for the purchases from "Dough."

44. Co-Conspirator 1 stated he would trade cocaine for heroin with JOHNSON. Co-Conspirator 1 identified JOHNSON as member of the "Milla Time" Bloods. Co-Conspirator 1 stated he had previously observed JOHNSON driving a black Jeep, a black Nissan Altima, and a red sedan. Co-Conspirator 1 stated JOHNSON was involved in a shootout and his vehicle was struck by gunfire.

F. Review of Co-Conspirator 1's Cellular Phone

45. On July 5, 2017, Co-Conspirator 1 provided written consent to law enforcement to view of the contents of his cellular phones. Co-Conspirator 1 identified JOHNSON as "Jack" on his contact list under cell phone number xxx-xxx-7929. This is the same cell phone number JOHNSON used to contact the UC. Law enforcement observed text messages between Co-Conspirator 1 and JOHNSON from April 13, 2017 to July 5, 2017. Law enforcement observed an ongoing conspiracy to distribute heroin between JOHNSON and Co-conspirator 1. On several occasions, JOHNSON provided Co-Conspirator 1 the address on Little River Turnpike, in Alexandria, Virginia as a meeting location. This address is across the street from where the UC met JOHNSON on June 9, 2017 to purchase 3 grams of heroin.

46. Law enforcement observed a text message conversation on April 13, 2017 between Co-Conspirator 1 and JOHNSON. JOHNSON texted "yea wat u need". Co-Conspirator 1 responded "I need 5 Blood, and I need it asap". JOHNSON responded "of da food" and then Co-Conspirator 1 responded "Yessir, that white shit for real. That shit boomin down here". Law enforcement observed a photo sent to Co-Conspirator 1 from JOHNSON on April 15, 2017 with a clear plastic bag with a white powdery substance on a digital scale. JOHNSON texted Co-

13

Conspirator 1 "Ready 4 u bro". Law enforcement purchased 3.5 grams of heroin from Co-Conspirator 1 on April 18, 2017.

47. Law enforcement observed a text message conversation on April 21, 2017 between JOHNSON and Co-Conspirator 1. JOHNSON texted Co-Conspirator 1 "I got 5 g's for 250 left if u want to view how it shake". Based on my training and experience, I know "5 g's" is in reference to 5 grams, and 250 is a reference to $250. On April 25, 2017, JOHNSON texted Co-Conspirator 1 "white china on deck". Co-Conspirator responded "same price?" JOHNSON responded "85 a joint", and then Co-Conspirator 1 responded "Ima need like 10". Based on my training and experience, I know "white china" to be slang for heroin. On May 5, 2017, Co-Conspirator 1 texted JOHNSON "Yo bro, can I get 28 of the white" and JOHNSON responded "Ite" "He want 25". Based on my training and experience, I know "white" is slang for heroin and "25" is in reference to $2,500 for an ounce of heroin.

48. Law enforcement observed that on June 28, 2017, JOHNSON sent a text message to Co-Conspirator 1 that stated " Bro I am letting u know this type shit is not me..i caught a tornado of setbacks..but ima b to u tomorrow..but bro jus watch I move 4 zones a week". Based on my training and experience, I know "zones" is slang for ounce quantities of controlled substances.

## CONCLUSION

4. Based upon the foregoing, I submit there is probable cause to support that on or about April 18, 2017 to on or about July 5, 2017 in Fairfax County, Virginia, Prince William County, Virginia, and elsewhere within the Eastern District of Virginia, JAVELL MARQUES JOHNSON (also known as "Jack") did knowingly and unlawfully possess with the intent to

distribute over one hundred (100) grams of heroin in violation of Title 21, United States Code, Section 841(a)(1) & (b)(1)(B).

Jonathan F. Earle
Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives

Subscribed and sworn to before me on _____ December 2017.
/s/
Theresa Carroll Buchanan
United States Magistrate Judge

The Honorable Theresa Carroll Buchanan
United States Magistrate Judge